UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,          CASE NO. 00-6265-CR-ZLOCH

    Plaintiff,

v.

**JOSEPH PONTECORVO,**

    Defendant.

_____/

## MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM
## OF LAW IN SUPPORT THEREOF

**COMES NOW**, the Defendant, **JOSEPH PONTECORVO**, by and through his undersigned counsel and files this Motion to Suppress Evidence pursuant to Federal Rule of Criminal Procedure 12 (b)(3) and the 4th and 14th Amendment of the U.S. Constitution and as grounds therefore would state that:

### SUMMARY OF FACTS

1. The Defendant, Joseph Pontecorvo, a thirty six year old white male, at the time of the alleged offense in this Indictment, was one person who resided and worked inside a dwelling located at 14 Northwest 6th Street, Fort Lauderdale, Florida. (Copies of photographs of the interior and exterior building are attached hereto as composite Exhibit "A")

2. This area of Fort Lauderdale is one of the most prolific crime areas in they county.

3. On many occasions, businesses including the Defendant's have been broken into and burglarized.



4. Mr. Pontecorvo operates a marine diesel mechanic business from this address and has done so for several years. He is also a member of the operating engineers union.

5. On August 27, 2000, at approximately 3:00 a.m. a call was received by the Fort Lauderdale Police Department. The Fort Lauderdale Dispatcher was advised that shots had been fired at an African American named Bobby Wilson who indicated that he was walking the streets of Fort Lauderdale at 3:00 a.m. because he had just gotten off a bus from Georgia.

6. Wilson described the individual who fired shots, as a white male, approximately 5'5 - 5'6 tall, in his early to mid thirties. The individual had a beard, mustache and sideburns. He was wearing a red shirt and blue jeans.[1]

7. Approximately five minutes later, several police units arrived at 14 Northwest Sixth Street, Fort Lauderdale, Florida. The Officers set up a perimeter as they cautiously approached the premises.

8. Five minutes after these Officers arrived, an Officer [2] advises dispatch that a subject is "inside the apartment at the very back door and he is leaning on the sink. He's just walked out the back door." The Officer then advises dispatch the subject is "coming out the back door." He then states the subject re-entered the

---

[1] The Defendant is a thirty six year old white male, 5'3, one hundred and thirty pounds, and does not have a beard, mustache, or sideburns. This information was obtained from the Defendant's booking sheet.

[2] The undersigned believes this to be Officer Roper. However, based upon the information available to the Defendant the undersigned cannot be certain.

apartment and is just walking around inside.

9. This Officer does not indicate the Defendant is armed with a weapon. Furthermore, there is no indication the subject has acknowledged the presence of police officers outside the premises. Additionally, there is no indication the subject inside the premises fits the description of the individual who was alleged to have just fired two shots.

10. Moments later, the Officer reports lights inside the premises have been shut off and that the Officer is stepping down from his vantage point.

11. Another Officer subsequently advises that he has informed the subject they are the police and to contact 911 to verify same. However, this Officer is unsure if there is a phone inside the premises.

12. Approximately fifteen minutes after arrival, a police unit advises dispatch the subject is banging on the front door. This Officer is uncertain as to the purpose of the subject's behavior.

13. Shortly thereafter a police unit requests "Rodney" to respond.[3] This unit inquires as to what "Rodney" sees when he is looking East inside the premises.

14. Rodney responds he couldn't really see inside the apartment located within the premises. He states there is a sink in the rear and the subject is washing himself up and turned on a light. The Officer reports the subject then walked back to the front of the apartment.

---

[3] The undersigned believes this is Officer Rodney Roper. (This in accordance with police reports obtained herein) Officer Roper is the Officer who was able to visually see inside the premises.

15. From approximately 3:05 a.m. until approximately 3:25 a.m. Law Enforcement Officers from the Fort Lauderdale Police Department attempted to contact the subject who was inside the premises. The Officers attempted to talk to the subject through the front door and attempted to communicate with him over a Public Address System. During this entire time there is no indication the subject acknowledged that police were present. Additionally, there is no indication that the subject was armed with a dangerous weapon, nor is there any indication the individual, who was inside the premises, had committed a crime. Furthermore, this subject did not make any threats, to the general public or any of the law enforcement officers who were present outside the premises.

16. Over the next three hours Law Enforcement attempted to contact the subject and utilized the assistance of a bullhorn to do so. However, the Defendant did not respond to the bullhorn or acknowledge the presence of the police.

17. During this time the police were able to obtain the name of the Defendant through a search of a vehicle tag number. The vehicle was located adjacent to this premises. The name of the individual was Joseph Pontecorvo, the Defendant herein.

18. Sometime later, an Officer was able to view the inside of the premises using specialized night vision glasses. The Officer advises he observes a television on as well as a lot of stuff scattered throughout the premises. The Officer does not advise he observes any weapons.

19. This Officer subsequently advises he observes a white male, in bed, with a beer

and a half empty bottle of Seagrams next to his bed. The Officer believes the Defendant to be passed out.

20. At approximately 6:19 a.m. an Officer drops a flash-bang grenade into the window and explodes it. The Defendant does not move after same was deployed and remained in his bed.

21. Within five minutes the police, without a warrant, bust open the front door and confront the defendant who was still lying in bed. After a brief struggle in which the defendant received fourteen (14) stitches in his upper nose, the Defendant was handcuffed and placed into custody.

22. A search of the premises revealed a shotgun, an alleged M 11 A1 Pistol with a suppressor. Also in the premises inside a camera bag was a baseball type object wrapped in tin foil with a fuse. According to police reports this object is allegedly some type of destructive device.

## MEMORANDUM OF LAW

19. The principle protection against intrusions into the dwellings of individuals is the warrant requirement imposed on agents of the government who seek to enter a home for the purpose of search or arrest. Welsh v. Wisconsin 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed 2d 732 (1984).

20. Entry into a home to conduct a search or make an arrest, therefore, is unreasonable under the Fourth Amendment unless done pursuant to a warrant, Payton v. N.Y. 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed 2d 639 (1980); U.S. v. Lynch, 934 F.2d 1226 (11th Cir. 1991).

21. Consistent with these principles a search or seizure carried out on a suspects premises without a warrant is per se unreasonable unless the police can show exigent circumstances. Steegald v. U.S. 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed 38 (1981); See also U.S. v. Mazuera 756 F.Supp. 564 (11th Cir. 1991); Schneckloth v. Bustamonte 412 U.S. 218, 36 L.Ed 2d 854, 93 S.Ct 2041 (1973); Welsh v. Wisconsin 466 U.S. 740, 80 L.Ed 2d 732, 104 S.Ct 2091 (1984); U.S. v. Vega, 221 F.3d 789 (5th Cir. 2000).

22. To justify a warrantless search, there must also exist exigent circumstances in addition to probable cause. U.S. v. Burgos 720 F.2d 1520 (11th Cir. 1983); U.S. v. Tobin 923 F.2d 1506 (11th Cir. 1991); U.S. v. Rodgers, 924 F.2d 219 (11th Cir. 1991).

23. The Government has the burden of proof of showing exigent circumstances. Coolidge v. New Hampshire 403 U.S. 443, 91 S.Ct 2022, 29 L.E 2d 564 (1971); U.S. v. Tovar-Rico 61 F.3d 1529 (11th Cir 1995).

24. The exigent circumstance exception must be carefully applied to each factual scenario U.S. v. Blasco 702 F.2d 1315 (11th Cir. 1991).

25. The exigent circumstance doctrine recognizes several common situations where the time consuming resort to a neutral magistrate for an arrest or search warrant is unnecessary. For example: Hot pursuit; Fleeing suspect; Danger of Arresting Officer or Public from Suspect; Mobility of the vehicle; Risk or removal or destruction of narcotics. Burgos at 1524-1525; Blasco, Supra; Lynch, Supra; Rogers, Supra.

26. The test of whether exigent circumstances exist is an objective one. The appropriate inquiry is whether the facts...would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured, [or there is danger of harm to the general public or police officers]; Tobin Supra at 1510; (Quoting U.S. v. Rivera 825 F.2d 152 (7th Cir. 1987); U.S. v. Mikell, 102 F.3d 470 (11th Cir. 1996); U.S. v. Reid, 69 F.3d 1109 (11th Cir. 1995).

27. Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be discovered in a particular place. Exigent circumstances arise when authorities have reason to believe that evidence is in danger of being destroyed or removed. Mikell, Supra at 474.

28. In this case, it is arguable, at best, that the police had probable cause at the time they approached the premises. The facts known to them at the time which suggest probable cause are as follows:

   a) An individual just fired two shots from a shotgun.
   b) A description, by the alleged victim, of a white male, early to mid thirties with a beard, mustache, and sideburns.
   c) The suspect was wearing a red shirt and blue jeans.
   d) The suspect was within a warehouse/apartment located at 14 Northwest 6th Street.
   e) Officers visually observed an individual inside the premises who was unarmed.

29. There is no indication, from any police officer, that the person inside the premises matched the description given to them, by the victim. Nor was there any indication the person inside the premises was armed or that he threatened the police officers or general public with violence.

30. Consequently the facts known to law enforcement at the time, do not meet the requisite standards of probable cause since there was no indication that evidence of a crime would be discovered inside the premises. Mikell, Supra.

31. Furthermore, although the Defendant was inside the apartment and the police were yelling their presence through the door by use of a bullhorn, there is no indication the defendant acknowledged he was aware the police were present outside.

32. Since this incident allegedly occurred at approximately 3:00 a.m. and the warrantless entry into the premises did not occur until approximately 6:30 a.m., the police officers had ample opportunity to apply for and receive a search warrant from a neutral and detached Magistrate.[4]

33. The Government is attempting to justify the warrantless search of the premises based upon the exigency of the situation. However to invoke the emergency rule to search a person's home, the exigencies of the situation must be so compelling as to make a warrantless search objectively reasonable. Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed 2d 290 (1978).

34. In U.S. v. George, 883 F.2d 1407 (9th Cir. 1989) The Court stated:

---

[4] Assuming arguendo the police had probable cause.

> Suspects who are inside their homes and unaware of their impending arrests generally have no reason immediately to flee, nor would they ordinarily have any reason immediately to destroy the fruits of their crime. Likewise, without more there is little reason for them to endanger the lives of themselves or others. Consequently, law enforcement officers confronting this type of situation can, without great difficulty, maintain surveillance of the premises and either wait to effectuate a valid public arrest when the suspects emerge or seek an arrest warrant from a neutral and detached magistrate.

35.  In utilizing this objective standard [5] in addition to paragraph 28 A-E, the police had the following additional facts available to them:

   f)  The Defendant was seen at various times between 3:05 a.m. and 3:20 a.m. within the premises.

   g)  The Defendant was unarmed.

   h)  The Defendant appeared to lock the front door.[6]

   i)  The Defendant was observed washing up at the sink.

   j)  The Defendant was observed for the remaining portion of the evening sleeping in his bed.

   k)  There were no firearms visible. Although, through the use of "night vision" glasses officers were able to observe a beer bottle and a half empty Seagrams bottle located on a table beside the Defendant.

   l)  Officers were able to observe a television was on.

---

[5] Reference made to Paragraph 26.

[6] See: U.S. v. Bates, 84 F.3d 790 (6th Cir. 1996)...barricading of apartment's front door did not create an exigent circumstance. Although it may be considered a relevant factor in determining whether exigent circumstances are present.

    m) Approximately three hours had elapsed from the time the Defendant was last observed moving through the premises until Officers dropped a flash-bang inside the premises.

    n) After the flash-bang was dropped the Defendant moved a little bit, but did not reach for any weapons.

    o) Approximately five minutes after deploying the flash-bang entry was made into the premises, and the Defendant was taken into custody while sleeping on his bed.

36. Applying this objective standard based upon the aforementioned facts, an exigency did not exist and the police had ample time to apply for and receive a search warrant. At a minimum the police could have applied for a "no-knock" warrant. [See: Wilson v. Arkansas, 514 U.S. 927, 115 S.Ct 1914, 131 L.Ed 2d 976 1995); State of Florida v. v. Bamber, 630 So.2d 1048 (Fla. 1994); Guerrie v. State of Florida, 691 So.2d 1132 (Fla. 4 DCA 1997); Benefield v. State of Florida, 160 So.2d 706 (Fla. 1964)].

37. Therefore any evidence seized as a result of the warrantless entry into the premises is unlawful and is "fruits of the poisonous tree" Wong Sun v. U.S., 371 U.S. 471; 83 S.Ct. 407, 9 L.Ed 2d 441 (1963) and must be suppressed.

**WHEREFORE**, the Defendant respectfully requests this Court enter an order granting this Motion to Suppress.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that a true and correct copy of the foregoing has been furnished via **U.S. Mail Delivery** to Assistant United States Attorney, Robin Rosenbaum, c/o U.S. Attorney's Office located at 500 E. Broward Blvd., Suite 700, Fort Lauderdale, Florida 33394 this 27th day of November, 2000.

**RUSSELL J. WILLIAMS, ESQ.**
Attorney for Defendant
400 Southeast Sixth Street
Fort Lauderdale, Fl 33301
(954) 525-2889

Page -11-

# PHOTOGRAPHS

# NOT

# SCANNED

PLEASE REFER TO COURT FILE